## STATE v. McBRIDE.*

No. 1674. Decided May 12, 1906 (85 Pac. 440).

1 CRIMINAL LAW — EVIDENCE — HANDWRITING.— In a prosecution for statutory rape, in which prosecutrix claimed to have received certain letters from defendant but admitted that she had never seen him write nor seen a specimen of his handwriting admitted to be genuine, and was not an expert at handwriting, she was not competent to testify that the letters were written by defendant, although she claimed that he had admitted having written two of the letters. STRAUP, J., dissenting.

---

1 Tucker v. Kellogg, 8 Utah 11.

*Competency of witnesses to handwriting, see note, 65 L. R. A. 963

APPEAL from District Court, Sixth District; John F. Chidester, Judge.

Albert McBride was convicted of crime, and appeals.

REVERSED AND REMANDED.

*A. J. Weber* and *S. R. Thurman* for appellant.

*M. A. Breeden,* Attorney-General, and *Jos. H. Erickson,* District Attorney for the State.

BARTCH, C. J.

The defendant was prosecuted for and convicted of the offense of carnally knowing a female over the age of thirteen and under the age of eighteen years, and was sentenced to imprisonment in the penitentiary. He thereupon appealed to this court. At the trial the prosecuting witness, so far as material here, testified, in substance, that she first met the defendant in March, 1904; that at that time she had a conversation with him, went buggy riding with him, and that when they returned he walked home with her; that she saw him again two days later. She says she saw him next at the post office April 1st; met him at the Johnston hotel, and saw him again at the same hotel on April 29th, between 8 and 9 o'clock in the evening; and that she walked with him to the depot, then back to the hotel and up to his room; that he told her his name was Jack McAuliffe; that on both occasions, April 1st and 29th, they had sexual intercourse; and that he accomplished his designs through force and persuasion. She identified four letters, Exhibits C, D, E, and F, signed "Jack McAuliffe," as letters she had received, and claimed he had talked to her about two of them, but she never saw him write. The defendant, testifying in his own behalf, denied the truth of all the material statements of the prosecuting witness. He testified that he never knew her until he saw her in the courtroom after this prosecution had been instituted; that he never had any association with her, and

never wrote to her either over his own signature or that of
Jack McAuliffe; that he did not write the letters which were
introduced in evidence, and never admitted to the prosecut-
ing witness that he had written them; and that he "never
had anything to do with her, or say to her, in any relation
whatever." In his testimony he also gave an account of his
whereabouts during the evening of April 29th, the time
when, it was charged, he committed the offense, and in this
he is corroborated by several witnesses. As to the commis-
sion of the act, on either occasion, the statements of the pros-
ecuting witness are not corroborated by any other direct evi-
dence.

The principal question presented on this appeal has arisen
out of the introduction in evidence of the letters referred to
above. Counsel for the prosecution, upon offering in evi-
dence those letters, interrogated the prosecuting witness as
follows: "Referring again to this letter marked state's Ex-
hibit C, I will ask you as to whose handwriting this is ?" To
this the defense objected upon the ground that no foundation
had been laid, it not having been shown that the witness was
competent; that it had not been shown that she knew the de-
fendant's handwriting; nor that she was an expert; nor that
she had ever seen him write. The objection was overruled,
and the witness answered that it was his handwriting. Prac-
tically the same proceedings were had respecting each of the
other letters. It is contended, in behalf of the appellant,
that the court erred in permitting the witness to thus testify,
and we are of the opinion that this contention is well founded.
Her own evidence showed her incompetency to testify on
the subject of his handwriting, for she admitted that she
never saw him write, and that she was not an expert on hand-
writing. It is true that, as to two of the letters, she claimed
he acknowledged to her that he wrote them or sent them, but
this he positively denied, and there was nothing to corrobor-
ate her statement. To identify the several letters as those
of the accused, the prosecution called the witness Brewerton,
who claimd to know the defendant's handwriting, but the
witness said: "I couldn't say positively that McBride wrote

either one of those letters, because I don't know. Didn't see him write them, and don't know that he wrote them. My knowledge of his handwriting is so vague that the slightest little circumstance that I think he might not have been there would have a tendency to raise a serious doubt about whether he wrote a certain letter that is exhibited to me." In the opinions of other witnesses, familiar with the accused's hand- writing, none of the letters were written by him.

To say the least, in view of such evidence, the authenticity of even the two letters above referred to, and which she claimed he acknowledged he had written, was in serious doubt and hence could not become the basis of comparison which was her only means of determining the genuineness of the other two; for there was no other paper in evidence, nor did the witness, so far as appears, ever have in her possession any instrument of any kind from the accused, the genuineness of which was not in dispute. The law is well settled that for the admission of such evidence it is essential that the authen- ticity of the paper, which becomes the standard of compar- ison, be established by positive proof and not left in uncer- tainty and doubt. Therefore,

"Before a witness will be permitted to testify as to a person's hand- writing from knowledge derived from seeing papers purporting to have been written by him, it must be clearly shown that such papers were in his handwriting." (15 Am. & Eng. Ency. Law, 257.)

"It is a prerequisite," says Mr. Wharton, "to the admission of such proof that the writings from which the witness has drawn his knowledge should be genuine. It will not be enough that the witness obtains his knowledge from letters whose genuineness is in dispute." (Whart., Crim- Ev. section 552.)

Mr. Rogers, in his work on Expert Testimony (section 138), says:

"The general rule moreover is that the proof of the genuineness of the instrument thus offered must be positive. It should be proved either by the admission of the party when the standard is not offered by him- self, or else by the testimony of persons who testify directly and posi- tively to having seen the party write the paper."

In *Martin v. Maguire,* 7 Gray (Mass.) 177, it was said:

"The mode of proving the genuineness of the paper in controversy, by comparison merely with other documents, has often been questioned elsewhere, though with us it is always allowed. But the paper with which the comparison is to be made must be unquestionably a genuuine paper, and that must be shown beyond a doubt."

This court, in *Tucker v. Kellogg,* 8 Utah 11, 28 Pac. 870, said:

"The common law excludes a comparison of handwriting as proof of signature. But to the general rule there is this exception: That if a paper admitted to be in the handwriting of the party, or to have been subscribed by him, is in evidence for some other purpose in the case, the signature or paper in question may be compared by the jury, with or without the aid of experts. The principal reasons given for the exclusion of evidence by comparison of handwriting are (1) the danger of fraud in the selection of specimens, and (2) if admitted, their genuineness may be contested, and collateral issues introduced into the trial. These reasons do not apply against the introduction of writings conceded by the parties to be genuine as specimens, because, if either party entertains a suspicion that the writing offered is spurious, he will not concede it to be genuine; and if all the parties concede the specimen to be genuine, no collateral issue can arise upon it. Therefore, we think there should also be an exception to the general rule excluding evidence by comparison admitting writings as specimens for comparison conceded by the parties to be genuine." (*McKeone v. Barnes,* 108 Mass. 344; *Cochran v. Butterfield,* 18 N. H. 115, 45 Am. Dec. 363; *Pavey v. Pavey,* 30 Ohio St. 600; *Nat. Un. Bank v. Marsh,* 46 Vt. 443; *Gibson v. Trowbridge F. Co.,* 96 Ala. 357, 11 South. 365; *Cohen v. Teller,* 93 Pa. 123; *Hyde v. Woolfolk,* 1 Iowa, 159; *Cunningham v. Hudson River Bank,* 21 Wend. 557; *Calkins v. State,* 15 Ohio St. 222; *Sartor v. Bolinger,* 59 Tex. 411; *Strother v. Lucas,* 6 Pet. [U. S.] 763, 8 L. Ed. 573.)

In the case at bar, as we have seen, the genuineness of all the letters was in dispute, and, therefore, while it may be conceded that in view of the testimony of the prosecuting witness, that they had been received by her, and that two of them had been the subject of conversation between her and the accused, the prosecution had a right to have the letters themselves, or at least the two which had formed such subject, admitted in evidence and read to the jury, it was not entitled to the admission of the testimony in question. Under the conflicting evidence it was the province of the jury to

consider the letters in determining the question of the defendant's guilt or innocence, and to give them such weight, in connection with all the other evidence, as the jury in its judgment deemed them entitled to receive; but the testimony in question ought to have been excluded.   Considering all the evidence, and the circumstances disclosed, with the fact that there was no direct testimony as to the commission of the act alleged as constituting the offense charged, except that of the prosecuting witness, we are unable to say that the admission of the testimony in question was not prejudicial to the rights of the accused.  Having reached such conclusion, it is not deemed important to discuss any other question presented.   The judgment must be reversed, and the cause remanded, with directions to the court below to grant a new trial.

It is so ordered.

McCARTY, J., concurs.

STRAUP, J.

I dissent.   The prosecutrix testified that the defendant told her his name was Jack McAuliffe, and that she became acquainted with and knew him by that name; that he wrote and sent to her some seven different letters under such name.   They were posted, and received by her in the regular course of mail.   It was shown that the defendant was at the various places where, and at the times when, the letters bore their postmarks.   Four of these letters, "C, D, E, and F," she produced at the trial.   The first letter referred to a ring sent to her under a separate cover.   After receiving the letter and the ring, she met the defendant, and he asked her if she had received the letter signed by the name of Jack McAuliffe, and the ring therein referred to. Upon her replying that she had, he told her that he wrote the letter, and sent the ring.   Another letter referred to some handkerchiefs.   After receiving that letter she had a conversation with him about it and the handkerchiefs, in which he told her that he wrote the letter, and gave the handkerchiefs, therein referred

to, to her. The four letters were all identified by the witness as having been received by her from the defendant in the course of mail. She then was asked by the state: "Q. Do you know his handwrite? A. Yes, sir. Q. Referring again to this letter marked 'C,' I will ask you whose handwrite this is." Here counsel for the defendant made the statement that the prosecution was qualifying the witness as an expert, and he desired to examine her on the voir dire. He then asked her: "Q. You have studied handwriting a great deal? A. I have studied it enough so I can tell his handwriting in that letter there. Q. You have seen him write, have you? A. No, sir. Q. Do you pretend to be an expert on handwriting? You never saw him write? A. He acknowledged to me that he wrote those letters. Q. You say it is his handwriting, do you pretend to be an expert on handwriting, do you? A. No, sir." Defendant's Counsel: "I object to her saying whose handwriting this is. She has not qualified as an expert. She hasn't seen him write, either." The State: "Did he acknowledge to you having written this letter? A. Yes, sir. Q. Did you have any conversation with him about other letters that he had written to you? A. Yes, sir. He asked me if I had received his letters during that time, and signed Jack McAuliffe, and I told him I had. Q. Do you know the defendant's handwrite? A. That is his handwriting. [Referring to Exhibit C.] The signature is his handwriting. Q. I call your attention to Exhibit D, and ask you if you know the handwrite, the signature and also the address? A. Yes. It is McBride, the defendant's." In like manner she testified concerning Exhibit E and F, of course, all over the defendant's objection as heretofore set forth. She also testified that she had a conversation with the defendant about Exhibit D, wherein she asked him why the letter was not stamped at American Fork, and he told her because it was mailed on the train.

The witness Brewerton testified that he had been acquainted with the defendant for more than a year, during which time he and the defendant both worked for the same

wholesale house at Salt Lake City; that the defendant was a traveling salesman for the house; that the witness checked the defendant's orders, which were two or three a week and sometimes more; and that he also helped to fill some of them; and that at several times when the defendant was making out his expense account, the witness saw him write. Then, on part of the state, he was further interrogated: "Q. Now, I will ask you, do you know the handwrite of McBride? A. Yes, sir, I think I can recognize it all right." Here defendant's counsel interrogated the witness on the voir dire: "Q. You say you know the handwriting of Mr. McBride? A. Yes. Q. Now do you know it from having frequently seen him write, or from claiming to be an expert on handwriting? A. I know it more so by the orders that have come in. Q. What do you have to do with his orders that come in; what is your business in relation to them? A. I have filled some of them, but my real business with them was to check off the orders. Q. In doing that, did you pay particular attention to the handwriting for any reason, or just take a casual glance at it? A. Well, just by the way, I say, I don't know that I studied it, just by seeing them come in. Q. You know his signature, do you? A. Yes, sir. Q. You can't be mistaken as to that? A. I don't think I can, No, sir. Q. Your familiarity goes to that extent that you think you know his handwriting and you know his signature? A. Yes, sir. Q. You don't claim to be an expert? A. No, sir." The witness was then again interrogated by the state, and was shown the letters in question and was asked if he knew whose handwriting they were, and he said that he did, and stated positively that they were in the handwriting of the defendant, except Exhibit F, of which the witness said: "I am not sure but that it looked like the defendant's handwriting, and I should say that it was his handwriting." On cross-examination he said that he had no doubt about the letter being in the handwriting of the defendant, unless two persons could write so much alike. "Q. If one were trying to imitate, they might write a great deal alike, mightn't they? A. Yes, sir. Q. You

won't say, will you, without some kind of qualification, that McBride wrote either one of those letters?" Here considerable discussion followed between counsel, in which counsel for the defendant insisted that the most that could be claimed for the testimony of the witness was that it is his opinion merely that the writing is the defendant's. The witness was then asked by the defendant's counsel: "Q. You wouldn't say, would you, positively, that McBride wrote either one of those letters? A. Well, I couldn't say positively because I don't know. Q. Well, that's what I am asking, and now you have answered. A. As near as I know. Q. Well, as near as you know. You didn't see him write them? A. No, sir. Q. You don't know that he wrote them, do you? A. No, sir." The witness was then asked why he hesitated about Exhibit F, dated July 1st. He answered that the last day of July (he probably meant June) was pay day, and that one or two days after pay day he and the defendant took dinner together at Salt Lake City, and for that reason there might be a question as to whether the defendant was at the place where the letter purports to have been written, on July 1st. Then follows the question, the substance of which is stated in the opinion by the majority court: "Q. Your knowledge of his handwriting is so vague that the slightest little circumstance that you think he might not have been there would have a tendency to raise a serious doubt about whether he wrote a certain letter that is exhibited to you? A. Yes, sir."

It is apparent, of course, that these matters, on cross-examination, go merely to the weight of the testimony, and not to the competency of the witness. It is conceded by the appellant that the witness Brewerton sufficiently qualified to express a belief or opinion as to the defendant's handwriting, because of the testimony of the witness that at different times he saw the defendant write. The appellant concedes, also, that all of the letters in question were sufficiently proved by the state to be the defendant's handwriting so as to entitle their admission in evidence. The particular complaint made in this regard is that the prosecutrix should not have been

permitted to express an opinion or belief that the letters were the defendant's handwriting, because she at no time had seen him write, and because she was not an expert on handwriting. From the objections made in the court below by counsel for the defendant, and from their brief on appeal, they seem to entertain the view that there are but two ways by which a witness may qualify so as to express an opinion as to the handwriting of another. One is by having seen the person write. The other is by comparison. The majority court seem to entertain the same view. For they say: "Her own evidence shows her incompetency to testify on the subject of his handwriting, for she admitted that she never saw him write, and that she was not an expert on handwriting." It being conceded that the prosecutrix had not at any time seen the defendant write, her testimony in the prevailing opinion is considered from the standpoint of identifying handwriting by comparison, the collation of two papers in juxtaposition for the purpose of ascertaining by inspection if they were written by the same person. Of course, when that kind of testimony is sought, it is essential that the writing or standard, with which the disputed writing is compared, be proved or admitted to be genuine, and that the witness making the comparison must be shown to have special skill and experience in making it, before he is entitled to express an opinion. It is to that kind of evidence that the authorities cited and quoted by the majority court, refer. But the prosecutrix was not called to give, nor did she give, that kind of testimony. The statement made by defendant's counsel that the state was qualifying her as an expert is erroneous. The state was not attempting to so qualify her, nor did she in the least qualify as such, and from that alone it is sufficient to say that she was not entitled to testify as an expert. But this witness, like the witness Brewerton did not testify as to defendant's handwriting by comparing a disputed writing with another writing, and by expressing a belief that the writings were written by the same person, or that if the defendant wrote one he also wrote the other. They testified as to his handwriting from their knowledge of and famil-

iarity with his handwriting. It may be said, in a very general sense, that all evidence of handwriting, except where the witness saw the disputed document written, is, in its nature, comparison. That is, it is the belief or opinion whch the witness entertains upon comparing the writing in question with an exemplar in his mind derived from some previous knowledge. But that it is not what is meant in law by proof of handwriting by comparison. (*Berg v. Peterson,* 43 Minn. 420, 52 N. W. 37; *Burdick v. Hunt,* 43 Ind. 381; *Travis v. Brown,* 43 Pa. 9, 82 Am. Dec. 540; 6 Enc. of Ev., 386; 15 A. & E. Enc. L., 263.) I think we can well eliminate the question of expert testimony as to handwriting, for it is not involved in the case. The question here is, was sufficient knowledge of or familiarity with the defendant's handwriting shown on the part of the prosecutrix to make her competent to express an opinion or belief as to whether the letters were in his handwriting. This leads to the inquiry, from what source or sources, other than seeing a person write, may a witness derive knowledge of or familiarity with the handwriting of such person so that the witness may be qualified to speak, from his knowledge and familiarity, as to such person's handwriting? In speaking of the qualifications and sources of knowledge of such a witness, in volume 6, p. 370, Enc. Ev., it is said:

"Any person who has seen the purported author write and has thus acquired a standard in his own mind of the general character of his handwriting is competent to testify as to the genuinneness of the signature in question. In showing familiarity with handwriting the witness is not restricted to the single means of having seen the person write. It is sufficient that the witness may have acquired knowledge of the handwriting by having seen writings admitted by the purported author to be his, or with his knowledge acted upon as his, or so adopted in the ordinary business of life as to create a reasonable presumption of genuineness."

Mr. Jones, on the Law of Evidence (volume 2, section 559), says:

"It has also been held that a witness is competent to testify as to the handwriting of another, although he has not actually seen him write,

if the witness has seen writing which such person has acknowledged or admitted to be his. Such acknowledgment may not only be in express terms, as where a person has formally acknowledged his signature or other writing to have been executed by him, but may be inferred as will be seen from other facts and circumstances or from the course of business. But when a witness has testified that he has neither seen a person write, nor any writing which he knew to be the writing of the person, his opinion as to the genuineness of such writing is not admissible."

In the case of *Flowers v. Fletcher,* 40 W. Va. 107, 20 S. E. 871, it is said:

"The law is that a witness who has any personal knowledge of a signature in controversy, however slight, has the right to give his opinion, and the weight of that opinion is a question for the jury, and not for the court. A witness who has seen a person write but once, and then only his abbreviated signature, may testify regarding the same; or if he has seen a signature admitted by the owner to be genuine."

Illustrations are also given by the court in *Redding v. Redding,* 69 Vt. 502, 38 Atl. 231:

"One is deemed to be acquainted with the handwriting of another person when he has seen him write, though but once, and then only his name; or when he has received letters or other documents purporting to be written by that person in answer to letters or other documents written by the witness or under his authority and addressed to him; or when he has seen letters or other documents purporting to be that person's handwriting, and has afterwards personally communicated with him concerning their contents, or has acted upon them as his, he knowing thereof and acquiescing therein; or when the witness has so adopted them into business transactions so as to induce a reasonable presumption and belief of their genuineness; or when in the ordinary course of business documents purporting to be written or signed by that person have been habitually submitted to the witness."

To the same effect also are the following: 1 Greenl., Ev., section 577; 1 Wigmore, Ev., sections 700, 701; *Berg v. Peterson,* supra; *Hammond v. Varian,* 54 N. Y. 398; *Kinney v. Flynn,* 2 R. I. 319; *Hammond's Case,* 2 Me. 33, 11 Am. Dec. 39; *Atl. Ins. Co. v. Manning,* 3 Colo. 224; *Gordon v. Price,* 32 N. C. 385.)

The prosecutrix having testified that she saw, and had in her possession, writings admitted to her by the defendant to have been written by him, and to be genuine; that she and

the defendant conversed about matters and things therein referred to, the subject-matter of which the defendant, in effect, acknowledged; and that, from having seen such writings, she was able to and could identify the defendant's writing, thereby made herself competent, in my opinion, to speak upon the subject. Such sources gave her a means of knowledge, and afforded an opportunity of becoming acquainted with the defendant's handwriting, equally as well as if, at some time, she had seen him once write his name. When it is said that a person, who has seen another write, may testify to that other's handwriting; that is but an illustration of identifying handwriting from knowledge. The witness in such case is qualified to speak, not merely because he saw such other write, but because he knows his handwriting from having seen him write. When a witness shows personal knowledge, not from having seen another write, but from having seen writings admitted by him to be his, or with his knowledge acted upon as his, that is but another way of also identifying handwriting from knowledge. But it is claimed that the testimony of the prosecutrix shows that the defendant only admitted or acknowledged to her that letters "C" and "D" were written by him, and that inasmuch as he, in his testimony, denied making such admissions or of writing any of the letters, "C" and "D" could not become the basis of comparison, which was her only means of determining the genuineness of the other two—"E" and "F"—because of the essential that the standard of comparison must be established by proof of genuineness. But the prosecutrix did not testify by comparison, but from knowledge. Whatever may be the rule and the reasons therefor, in that regard, when evidence is sought by comparison, they do not apply when the witness speaks from personal knowledge of the handwriting. When a witness testifies that at some previous time he saw the defendant write, if only his name, and for that reason he knows his handwriting, that qualifies the witness to speak as to the defendant's handwriting of a document or signature exhibited to the witness. Because the defendant denies the fact that such witness ever saw him

write, it does not render the testimony of the witness incompetent, nor is it essential before the witness is permitted to speak upon the subject that the admission of the defendant of such fact be first had. All that is necessary is that the fact of the witness having seen him write be proved, which generally is done by the witness himself. Now, when a witness qualifies himself by showing knowledge of the defendant's handwriting from having seen letters or writings acknowledged or admitted by him to the witness as his handwriting, the fact that the defendant may or does deny that he made such acknowledgment or admission, or that he wrote the writing with respect to which the admission is claimed, does not render the witness incompetent, in such instance, any more than in the other. All that is essential is that proof be made of such an admission or acknowledgment, which, of course, may be done by the witness. The competency of the witness is a matter for the court upon the showing made at the time when the witness is asked to express his belief. If sufficient knowledge on the part of the witness as to the handwriting of the purported author is shown, his testimony on the subject may be received. Whether the statements of the witness in regard to his knowledge are thereafter controverted by the defendant or by other testimony, goes merely to the weight of the testimony and to the credibility of the witness, and not to his competency in the first instance. It certainly was proper to have the prosecutrix state that the defendant admitted to her that he wrote Exhibits C and D. That alone was sufficient proof that he wrote them. It also was proper for her to state that the defendant corresponded with her, and that she received letters purporting to come from him in the regular course of mail, and that after they were received by her, she and the defendant conversed about their contents; the subject-matter of which the defendant acknowledged and in which he acquiesced. From such sources sufficient knowledge on her part may be obtained to enable her to speak as to the defendant's handwriting, not only as to Exhibits C and D, but as to E and F as well, or as to any other writing purporting to have

been written by him. And the fact that the defendant thereafter, in his testimony, denied that he made any such admissions or that he wrote the letters, or that he ever saw the witness until in the courtroom, or that because he was corroborated as to his alibi, or because the prosecutrix was not corroborated by any "direct evidence" as to the acts of sexual intercourse, did not, in my judgment, destroy her competency.